
FILED
2022 Jun-07  PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**CINDERELLA REEDER,** *as*     )
*personal representative of the*     )
*Estate of Douglas Harold Hart,*     )
    ) Case No.: 2:22-cv-292-AMM
**Plaintiff,**     )
    ) The Honorable Anna M. Manasco presiding
**v.**     )
    )

**THE CITY OF VESTAVIA HILLS, a municipality; DAN RARY, individually, Chief of Police for The City of Vestavia Hills; NATHAN RYAN STEWART, individually, a police patrol officer for The City of Vestavia Hills Police Department; THOMAS MITCHELL CAMPBELL, individually, a police patrol officer for The City of Vestavia Hills Police Department; BENJAMIN GILES, individually, a corporal and supervisor of police patrol officers for The City of Vestavia Hills Police Department; JOEL GASTON, individually, a lieutenant and supervisor of police patrol officers for The City of Vestavia Hills Police Department;  *No. 1*, whether singular or plural, Plaintiff hereby intending to designate that person, firm, corporation or other legal entity known only to the Plaintiff as Dan Rary, Nathan Ryan Stewart, Thomas Mitchell Campbell, Benjamin Giles and Joel Gaston; *No. 2*, whether singular or plural, Plaintiff hereby intending to designate that person or persons who failed to properly train, instruct, order, command and/or supervise the City of Vestavia Hills police patrol officers who were involved in the pursuit, stopping and/or shooting of Douglas Harold Hart (Hart) while he was experiencing a mental health crisis, contributing to the unconstitutional violations of Hart's civil rights and death on February 8, 2020;  *No. 3*, whether singular or plural, Plaintiff hereby intending to designate that person or persons who failed to intervene, while in a position to intervene, to stop the shooting of Hart by police officers of the City of Vestavia Hills, in violation of Hart's constitutional rights and subjecting him to death; *No. 4*, whether singular or plural, Plaintiff hereby intending to designate that person or persons who negligently, wantonly, and /or unskillfully addressed the mental health crisis being experienced by Hart contributing to the cause of his death; *No. 5*, whether singular or plural, Plaintiff hereby intending to designate that person or persons who with deliberate indifference failed to protect Hart from being shot by others from behind while he drove away during a mental health crisis on February 8, 2020, in violation of Hart's constitutional rights and subjecting him to death; *No. 6,* whether singular or plural, Plaintiff hereby intending to designate that person or persons who with deliberate indifference failed instruct, order or command  Defendants Campbell and Stewart not to shoot Hart as he was leaving the scene after he was stopped, while in a mental health crisis,**

**in violation of Hart's constitutional rights and subjecting him to death; *No. 7*, whether singular or plural, Plaintiff hereby intending to designate those persons, other than those described above, who failed to safely prevent Hart from driving away without shooting him and those who had authority to order, command and supervise those who failed to safely prevent Hart from driving away without shooting him while Hart was experiencing a mental health crisis, in violation of Hart's constitutional rights and subjecting him to death on February 8, 2020; *No. 8*, whether singular or plural, Plaintiff hereby intending to designate that person or persons who with deliberate indifference, escalated the encounter with Hart and unnecessarily used deadly force by shooting of Hart from behind while he was experiencing a mental health crisis, contributing to the unconstitutional violations of Hart's civil rights and his death on February 8, 2020; *No. 9*, whether singular or plural, Plaintiff hereby intending to designate those persons, other than those described above, whose negligence, breach of the standard of care, deliberate indifference or other wrongful conduct contributed to cause the death of Hart on the occasion made the basis of this suit.**

**Plaintiff avers that the identity of the Fictitiously named Party Defendants is otherwise unknown to Plaintiff at this time, or, if their names are known to Plaintiff at this time their identity as proper Party Defendants is not known to Plaintiff at this time; but their true names will be substituted by amendment when the aforesaid lacking knowledge is ascertained.**

**DEFENDANTS**

## FIRST AMENDED COMPLAINT

## <u>INTRODUCTORY STATEMENT, JURISDICTION AND PARTIES</u>

1.      This is an action to enforce the constitutional rights of the decedent, Douglas Harold Hart ("Hart"), who was killed by Defendant Thomas Mitchell Campbell ("Campbell"), and/or Defendant Nathan Ryan Stewart ("Stewart"), with the complicity and participation of all Defendants, on February 8, 2020.

2.      While in his vehicle, moving away from the Defendants and experiencing a mental health crisis, Hart was unjustifiably and unnecessarily shot and killed in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, also resulting in Mr. Hart's wrongful death under Ala. Code § 6-5-410.

3.      This Court has jurisdiction over this matter pursuant to 42 U.S.C. §1983, which provides a cause of action for anyone whose constitutional rights are violated by one acting under

color of state law. Venue is proper in that the acts of the Defendants that led to the wrongful death of Hart occurred in Jefferson County, Alabama.

4.     Cinderella Reeder ("Cindy") is the widow of Douglas Harold Hart ("Hart") and has been appointed as the personal representative of his estate by the Probate Court of Jefferson County, Alabama. She is suing in that capacity on behalf of Hart's estate.

5.     Defendant, Dan Rary ("Rary"), was at all relevant times the Chief of Police for the City of Vestavia Hills and was acting in that capacity and under color of state law. He is sued in his individual capacity.

6.     Defendant, City of Vestavia Hills ("Vestavia") is a municipal corporation situated in this Court's jurisdiction.

7.     Defendant, Thomas Mitchell Campbell ("Campbell") was at all relevant times a police officer for the City of Vestavia Hills and was acting in that capacity under color of state law. He is sued in his individual capacity.

8.     Defendant, Nathan Ryan Stewart ("Stewart") was at all relevant times a police officer for the City of Vestavia Hills and acting in that capacity under color of state law. He is sued in his individual capacity.

9.     Defendant, Benjamin Giles ("Giles") was at all relevant times a corporal and supervisor of police patrol officers for the City of Vestavia Hills and acting in that capacity under color of state law. He is sued in his individual capacity.

10.     Defendant, Joel Gaston ("Gaston") was at all relevant times a lieutenant and supervisor of police patrol officers for the City of Vestavia Hills and acting in that capacity under color of state law. He is sued in his individual capacity.

**FACTUAL ALLEGATIONS**

11.     Hart suffered from episodes of depression and suicidal ideation prior to being shot on February 8, 2020. He had been diagnosed years earlier with depression and sought treatment, including hospitalization. Hart was an outdoorsman who enjoyed skiing, hiking, scuba diving, mountain biking, and traveling with his wife. He enjoyed his community and spending time with close friends and neighbors, entertaining, cooking and grilling for them. Hart was a longtime resident of Jefferson County, Alabama and was by all accounts a law-abiding citizen who had no involvement with law enforcement until the incident giving rise to this action.

12.     This incident was partially documented by dashcam videos with audio from the vehicles of Defendant Thomas Mitchell Campbell and another Vestavia Hills police officer, Phillip Holly, and citizen Glen Landry, as well as dispatcher 911 recordings.

13.     References herein to "745 or "45" refer to Officer Holly, "738" or "38" refers to Defendant Stewart and"746" or "46" refers to Defendant Campbell.

14.     On February 8, 2020, at approximately 2:20 p.m., Plaintiff was worried about her husband, Mr. Hart. She had not seen him much that day, and he left his phone at the house. His depression and mental health issues were getting increasingly worse.

15.     Plaintiff called a close friend and neighbor, Glen Landry ("Landry"), explained that Hart was missing and asked if Landry knew where Hart was. Landry did not but stated he would look for Hart on his way to the gym.

16.     Landry located Hart sitting at the Cahaba Boat launch on Old Overton Road and stopped to talk with Hart for approximately five minutes. Not wanting to worry Hart about his wife's concern, Landry kept the conversation light. As they discussed the weather and the river water level being up, a gentleman walked by. Landry chatted a little more but since Hart seemed fine, Landry left.

4

17.     After leaving, Landry called Plaintiff and explained that he had located Hart at the river just chilling out, and that Hart seemed fine. Landry assured Plaintiff and that he would check on Hart again after he left the gym.

18.     Approximately 30-45 minutes later, Landry left the gym and returned to the boat landing, but Hart wasn't there. Landry found Hart about a mile further down on the side of Old Overton Road by the river, so Landry stopped and talked to Hart again. Landry called out to Hart saying, "Hey Doug, people are worried about you." At that point, Landry realized that Hart was mentally struggling. Landry tried to talk to Hart, letting him know that people cared about him, that people were here for him, and asked Hart if he wanted to talk, etc. Hart told Landry to just look after his wife. Landry responded that Hart was going to be around to look after her, so no one needed to look after his wife. Hart said, "Well Cindy has dinner on the table that's probably why she is worried." In response, Landry told him to get on home, and Hart said "Okay" and pulled off. About a minute or two later, Landry headed home.

19.     Landry drove by Hart's house on his way home, but he did not see Hart's vehicle. Landry continued to drive around the area and found Hart pulled off the side of the road at the same spot – about a mile from the boat landing. Landry pulled off the side of the road next to Hart's vehicle. Landry stayed in his vehicle but rolled the window down and honked his horn to get Hart's attention. They started talking loudly because of the distance.

20.     At approximately 4:11 p.m., Vestavia Hills 911 Police dispatch radioed, "738, 746, need you in route, Person with a weapon, receiving the call from 3706 River Terrace Circle. Reporting she can hear two men talking, one male has a gun and he's telling the other man to leave. She can see the vehicles on the roadway. 746 16-11, 1038 16-11. They are going to be on

Old Overton Road in the woods near that address River Terrace. Two older white males, two vehicles, a grey 4-door GMC truck and an older red Volkswagen with stickers on it."

21.     At approximately 4:13 p.m., dispatch radioed, "Units responding to River Terrace, your caller is still on foot, she will be waiting at Old Overton Road and River Terrace." A minute later, dispatched continued, "callers name is Carolyn, purple Sweatshirt, black leggings." A Vestavia police officer asked, "13 Did she see the weapon or she just heard somebody talk about a weapon?" To which Dispatch responded, "Units responding, that's affirmative she saw it."

22.     At approximately 4:18 p.m., Campbell arrived at Carolyn's location. Campbell briefly spoke to her and another witness, John Camp, who had relevant information. Carolyn stated that the vehicle was a red 1980's style wagon with a diver's tag on the front and a bunch of stickers on the back. In response, Campbell radioed in, "I am out with Carolyn, she says it is a red wagon 1980's style with a diver's sticker – divers tag on the front of the car and a bunch of stickers on the rear." Carolyn continued to explain that "the other vehicle might still be down there," indicating the location where the two men were originally. Carolyn stated that the man in the other vehicle didn't have a gun but the man in the red wagon did. Campbell asked Carolyn, "What type of gun did he have? Was it a pistol or a rifle?" Carolyn responded that it was a "small pistol, black." As Carolyn explained, Hart was not pointing the gun at the other man but held it at his side while they talked.

23.     Carolyn explained to Campbell that by the way the two men were acting and talking with each other, and their tone of voice, that she got the impression the men knew each other. Campbell verbally acknowledged by responding, "Right, right." Carolyn further described calm interactions between the two men and that she decided to turn around and continue walking in the opposite direction.

24.     Mr. Camp told Campbell that, as he was driving by, Hart was outside his car speaking with another gentleman, and that Hart motioned for Camp to pass. Camp did so and eventually came upon Carolyn. Camp explained to Campbell that he did not see a gun when he passed Hart and the other vehicle.

25.     Campbell asked Carolyn and Camp, "Were they older or younger?" Carolyn responded, "Older around 70 probably."

26.     Carolyn told Campbell that she felt like Hart was suicidal and then asked Campbell if he was going to go check for the other vehicle, to which Campbell responded that he was. At no time did Campbell report that Carolyn or Camp felt that Hart posed an immediate threat or danger to them or anyone else.

27.     At 4:19 p.m., an unknown officer radioed in, "738 I'm in the vicinity of Liberty Parkway."

28.      That same minute, Holly spotted Hart traveling north on Liberty Parkway approaching a stop sign. Holly made a U-turn and pulled behind Hart's vehicle with his lights and sirens off. Holly then radioed that he had Hart's vehicle in sight at Liberty Parkway and River Road.

29.     At 4:20, as Hart started to make his way through an intersection of Liberty Parkway, Holly turned on his vehicle light bar and continued to follow behind Hart. Holly radioed in Hart's vehicle tag registration number while continuing to follow him, and about the same time, Defendant Campbell left the location of the witnesses.

30.     As Holly and Stewart followed Hart, Campbell radioed that Hart had a handgun but did not mention that the witness believed Hart to be suicidal.

31.    At no point did any of the officers discuss concerns of Hart being a danger to the public, nor did they discuss how to safely stop Hart's vehicle.

32.    While behind Hart, Holly activated his siren and followed Hart, who turned onto Old Overton Road.

33.    As Holly and Stewart passed the Carraway Davie House Entrance off Old Overton Road, they passed Hart's friends parked at the entrance. One of Hart's friends waved trying to get the police officers' attention, but to no avail.

34.    While following Hart, Holly used his PA system to yell out to Hart to stop, "Driver pull over." At 4:22:52, Hart complied and stopped his car.

35.    Holly yelled out on the PA, "Driver put your hands out the window, Driver put both hands out the vehicle. Put the car in park." Hart put his left hand out the window and his right hand could be seen through the back window for some of the time, but his car began rolling so Holly said again to put the car in park, and Hart's car stopped again.

36.    At this location, Old Overton Road is a two lane, paved road with small grass shoulders on each side with the river to Hart's left and a wooded hillside to Hart's right.  There are no businesses, residential housing, or other traffic in sight.

37.    At almost the same time, Campbell approached in his vehicle from the opposite direction on Old Overton Road, and Holly told Campbell over the radio, "hey hold what you got right there, stop." Holly did not instruct Campbell or anyone else about a plan to prevent Hart from continuing to drive his car.

38.    Upon information and belief, Defendants Rary, Giles, Gaston and/or Fictitious Defendants No. 2, No. 3, No. 4, No. 5, No. 6, No. 7 and No. 9 (Collectively referred to as the "Supervising Defendants") were listening to the conversations of the Patrol Defendants during

their investigation and encounter with Hart prior to the shooting of Hart, and all said Supervising Defendants had the ability and authority to instruct, order, or command the actions of the Patrol Defendants at any time on February 8, 2020.

39.     None of the Defendants instructed, ordered, or commanded the Patrol Defendants on how to stop Hart's vehicle from driving away without shooting him.

40.     After Hart stopped, Holly told him to "reach with your left hand and open the door, keep your hands where we can see them." Hart did not get out of his vehicle but did hold his hands up for the officers, which were clearly visible. Hart never showed a gun, nor is there any mention of the Patrol Defendants seeing a gun before Hart was shot.

41.     As Hart was stopped in front of Holly and Stewart, Campbell positioned his patrol car approximately 30 to 50 yards away from the front of Hart's vehicle, in his own lane of travel – leaving most of Hart's lane open for Hart to drive through. Campbell did not use any other means to stop or slow Hart's vehicle. No other police vehicles were requested to assist in blocking both lanes of travel and the small shoulders so that Hart could not pass.

42.     At this point, Hart started to drive forward slowly away from Holly's and Stewart's vehicles. As Hart approached Campbell's patrol car, Campbell positioned himself in front of Hart's slowly approaching vehicle with his gun drawn and pointed at Hart while he yelled for Hart to stop. Hart stopped in response and held both hands up above his steering wheel where they could be clearly seen. Hart was visibly an elderly male. Hart never showed a gun or threatened Campbell in any way. Instead, with both hands up and visible, and in a calm demeanor, Hart told Campbell multiple times that he is "not going to hurt" Campbell.

43.     As Hart was stopped by Campbell, Holly moved his vehicle behind Hart's car, exited, and approached the rear of Hart's vehicle on foot. Hart still had his hands up, but he stayed in his vehicle.

44.     Holly approached Hart's car from behind and told Campbell to step away from in front of Hart's car. Following Holly's instruction, Campbell stepped away from the front of Hart's vehicle, at which time Hart resumed moving forward slowly. There was no contact between Campbell and Hart's vehicle except Campbell touching the windshield with his hand.

45.     As Hart began to slowly drive away, Holly holstered his gun and began running back to his vehicle to continue the pursuit of Hart. Campbell followed suit, partially holstering his gun and moving back to his vehicle. Both Holly and Campbell turned their backs to Hart as he drove slowly away.  By their actions, both officers demonstrated they did not feel so threatened by Hart – whether to themselves or otherwise – as to require the use of deadly force.

46.     Nonetheless, and even though Hart's vehicle already passed Campbell, Stewart ran forward from behind Holly's vehicle and well behind Hart's vehicle, with his gun drawn, taking aim at Hart and the rear of his vehicle in a shooting stance. And despite starting to holster his weapon and move toward his patrol car like Holly, once Campbell saw Stewart assume a shooting stance, Campbell himself spun around and also took aim at Hart. Hart's vehicle had already traveled multiple car lengths away from the officers.

47.     Instead of stopping Stewart from shooting Hart, Campbell joined Stewart in firing numerous rounds at Hart through the rear of Hart's vehicle as he was driving slowly away from them. Campbell fired at least five (5) rounds from his weapon, and Stewart fired at least two (2) rounds from his weapon. Two of those rounds struck Hart's vehicle, and one struck Hart in the

back of the head, causing him to lose control of his vehicle and run off the road, down a cliff, hitting multiple trees and boulders before coming to a rest nose-down in the Cahaba River.

48.     Hart never showed a gun or threatened any of the police officers or anyone else in the immediate area. Despite posing no imminent threat to Campbell, Stewart, Holly, or anyone in the vicinity, Campbell and Stewart fired their weapons multiple times at Hart as his vehicle slowly moved away from the Defendants.

49.     Instead of instructing Defendants Campbell and Stewart to pursue Hart by car and not to shoot Hart, the Supervising Defendants did nothing and failed to intervene in the shooting of Hart by Campbell and Stewart.

50.     According to the Jefferson County Coroner, the autopsy revealed multiple injuries due to impact with a blunt object, including, but not limited to, fractures of multiple ribs, the sternum, the left clavicle, the right femur, lacerations to the liver, spleen, and right kidney. Blood filled the abdominal cavity and the right pleural cavity. "These injuries would be expected to cause death rather quickly. The gunshot wound to the head injured the soft tissues of the scalp and contused the brain but did not enter the intracranial cavity. There was no evidence of close-range fire."

51.     Additionally, the authors of the Autopsy concluded, "Although the gunshot wound to his head was not fatal in and of itself, it did cause injury to Mr. Hart's brain that likely impacted his ability to maintain control of his vehicle on the roadway. Therefore, it is our opinion, based on the circumstances surrounding death and the findings at autopsy that Mr. Douglas Harold Hart died as a result of blunt force injuries due to a motor vehicle/fixed object collision. The gunshot wound to the head contributed to his death. The manner of death is best classified as homicide…"

52.     Because of his discussion with witness Carolyn, Campbell knew of Hart's mental health crisis when Carolyn told Campbell that she believed Hart to be suicidal prior to Campbell engaging Hart and prior to his shooting Hart.

53.     Because of his discussion with witness Carolyn and information previously provided to dispatch by Carolyn, Campbell knew that the conversation that Carolyn heard earlier was between Hart and a man he apparently knew, and the other man was likely still in the area in a Grey 4-Door Truck.

54.     Because of his discussion with witnesses Carolyn and Camp, Campbell knew that neither Carolyn nor Camp had been threatened by Hart nor had they expressed any fear of immediate threat or danger from Hart.

55.     Because of his discussions with witness Camp, Campbell knew that Camp had come within feet of Hart but did not see Hart brandishing a weapon or acting dangerous or erratic.

56.     In the face of clear and unmistaken knowledge that Hart was suicidal, Defendants did not contact Hart's wife, his friends whom they passed on the road, or any mental health professional with experience or expertise in assisting someone experiencing a mental health crisis to assist.

57.     Defendants failed to implement safe and standard police tactics to prevent Hart from driving away, including failure to block the available pathways or the use spikes or tack strips to deflate Hart's tires.

58.     Defendants failed to de-escalate the situation, and in fact unnecessarily and rapidly escalated tensions by taking shooting stances in front of and behind Hart's vehicle with guns drawn and pointed toward Hart.

59.     Alabama Code § 13A-3-27 states in relevant part,

(a)   A peace officer is justified in using that degree of physical force which he reasonably believes to be necessary, upon a person in order:

(1)   To make an arrest for a misdemeanor, violation or violation of a criminal ordinance, or to prevent the escape from custody of a person arrested for [such offense], unless the peace officer knows that the arrest is unauthorized; or

(2)   To defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force while making or attempting to make an arrest for a misdemeanor, violation or violation of a criminal ordinance, or while attempting to prevent an escape from custody of a person who has been legally arrested for [such offense];

(b)   A peace officer is justified in using deadly physical force upon another person when and to the extent that he reasonably believes it necessary in order:

(1)   To make an arrest for a felony or to prevent the escape from custody of a person arrested for a felony, unless the office knows that the arrest is unauthorized; or

(2)   To defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force.

60.   Hart was not a fleeing felon, nor had Hart committed any crime before multiple police officers were dispatched to confront him. No member of law enforcement articulated any suspicion that Hart had committed, or was committing, any felony, and there was likewise no probable cause that he had committed or was committing any felony before being shot.

61.   After the incident and after seeking counsel, Defendants justify Hart's killing by claiming Hart struck Campbell with his vehicle and that Hart was a threat to the public at large at the time he was killed. Neither is true. In fact, Hart only began to drive forward once Campbell moved out of the way of Hart's vehicle. Indeed, Campbell himself (along with Holly) began holstering his weapon and returning to his vehicle after Hart passed by. Likewise, Hart never drove erratically or displayed any intent to harm others while Holly and Stewart followed him;

Hart never reached for or touched a weapon in any encounter with Defendants; Hart constantly showed his empty hands and repeatedly, calmly assured Campbell he would not harm the officers; and the entire confrontation occurred on a secluded road.

62.    Upon information and belief, Supervising Defendants were able to listen to the actions of Defendants Campbell, Stewart (Patrol Defendants), and Holly as they were dispatched to the scene where Hart was located. During the encounters with the witnesses, the pursuit of Hart while Hart was driving and the encounters with Hart when he was stopped none of the Supervising Defendants ordered or commanded the Patrol Defendants or Holly on a safe means to bring Hart's vehicle to a stop.

63.    Upon information and belief, Supervising Defendants were able to listen to the actions of Patrol Defendants and Holly as they were dispatched to the scene where Hart was located and their encounters with Hart. Neither during encounters with witnesses, nor during the pursuit of Hart, nor during Hart's stop did any of the Supervising Defendants order or command the Patrol Defendants to secure the presence or advice of a mental health professional with experience or expertise in assisting someone experiencing a mental health crisis.

64.    Between 2015 and 2020, studies have shown that nearly a quarter of all people killed by police officers in America were known to have a mental illness. *Mental Health By the Numbers*, Nat'l Alliance on Mental Illness, *available at* https://nami.org/mhstats (last visited May 25, 2022).

65.    In a study of "Deaths Due to Use of Lethal Force by Law Enforcement" published in 2016, of the 812 fatalities identified between 2009 and 2012 in 17 U.S. states, about 22% of cases were mental health related; 18% were suspected "suicide by cop" incidents, with white victims more likely than black or Hispanic victims to die in these circumstances. Sarah DeGue,

*Deaths Due to Use of Lethal Force by Law Enforcement,* Am. J. Preventative Med. (2016), *available at* https://www.ajpmonline.org/article/S0749-3797(16)30384-1/fulltext (last visited May 24, 2022).

66.    According to the U.S. Department of Justice, about 44% of all persons in local jails between 2011 and 2012 had a history of mental illness and about 26% had serious psychological distress in the 30 days before arrest. U.S. Dept. of Justice, Special Report, *Indicators of Mental Health Problems reported by Prisoners and Jail Inmates* (June 2017), *available at* https://bjs.ojp.gov/content/pub/pdf/imhprpji1112.pdf (last visited May 25, 2022).

67.    Alabama Code § 22-52-91 states that "when a law enforcement officer is confronted by circumstances and has reasonable cause for believing that a person within the county is mentally ill and also believes that the person is likely to be of immediate danger to self or others, the law enforcement officer shall contact a community mental health officer. The community mental health officer shall join the law enforcement officer at the scene and location of the person to assess conditions and determine if the person needs the attention, specialized care, and services of a designated mental health facility." Upon information and belief, the Defendants in this instance did not contact a community mental health officer. Certainly, none appeared prior to Hart being killed.

68.    Upon information and belief, the City of Vestavia, Supervising Defendants, and/or the Fictitious Defendants No. 2 and No. 4, were responsible for the training, instruction, direction and supervision of the Patrol Defendants and other police patrol officers for the City of Vestavia on and prior to February 8, 2020.

69.    Training records show that Campbell completed Police Academy Training on April 4, 2019, and Stewart completed Police Academy Training on April 12, 2018.  According

to the training records Stewart participated in a course entitled "First Responders Mental Health & ADA." It is unknown to Plaintiff at this time as to the scope and efficacy of the course "First Responders Mental Health & ADA". There is no record of Campbell receiving any specific training for responding to individuals with mental health illnesses or in a mental health crisis.

70.     Upon information and belief, the City of Vestavia, Supervising Defendants, and/or the Fictitious Defendants No. 2 and No. 4, did not provide sufficient training, if any, to the Patrol Defendants or their police patrol officers for dealing with individuals with mental health issues or suffering from a mental health crisis prior to Hart's death.

71.     Upon information and belief, the City of Vestavia Hills, nor the Supervising Defendants, had adopted the Crisis Intervention Team (CIT) approach for dealing with mentally ill individuals, nor is there any evidence that the City of Vestavia Hills Police Department had a Crisis Intervention Coordinator in place prior to or on the date Hart was shot.

72.     Upon information and belief, the City of Vestavia, Supervising Defendants, nor the Fictitious Defendants No. 2 and No. 4, provided sufficient training, if any, to its police patrol officers, including Patrol Defendants, on how to bring a moving vehicle, like Hart's vehicle, to a safe stop or on how to prevent a stopped vehicle from proceeding to move away from its police patrol officers.

73.     Rary's actions or inactions in this instance constitute the policy, custom and/or practice of the City of Vestavia Hills.

74.     Rary was the policy maker for the City of Vestavia Hills for law enforcement matters prior to and on the date Hart was shot, thus his directives, actions or inactions constitute the policy, custom, or practice for the City of Vestavia Hills.

75.     As police chief, Rary knew, or should have known, of the appropriate protocols and techniques to deal with people suffering from mental illness. At a minimum, Rary knew or should have known that specific training and standard policies would dictate that there was no immediate need to use deadly force against Hart. Defendants failed to act as reasonably prudent police officers in similar circumstances by failing to request or obtain the assistance of someone better able to address Hart's mental problems than they.

76.     Rary and/or the other Supervising Defendants, acted with deliberate indifference by failing to ensure that appropriate protocols and techniques, well known to law enforcement, were taught and followed in the use of deadly force and in addressing individuals in a mental health crisis such as Hart's. Supervising Defendants' failure to do so resulted in Hart's death.

77.     Rary and/or the other Supervising Defendants, acted with deliberate indifference by failing to ensure that appropriate protocols and techniques, well known to law enforcement, were taught and followed in on how to bring a moving vehicle, like Hart's vehicle, to a safe stop or on how to prevent a vehicle from proceeding to move away from its police officers after is has stopped.  Supervising Defendants' failure to do so resulted in Hart's death.

78.     Supervising Defendants' actions were deliberately indifferent to their potential consequences. The totality of the circumstances dictated that a reasonable police officer in a similar situation would employ alternative approaches, of which Defendants were, or should have been, aware and which would have prevented Hart's unnecessary death.

79.     The individual Defendants' conduct, jointly and severally, showed deliberate indifference for the Constitutional rights of Hart, which caused his death.

80.     The individual Defendants' wrongful conduct, jointly and severally, also exhibited negligence, carelessness and unskillfulness which contributed to the death of Hart.

**COUNT ONE**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT- LOSS OF LIFE AND LIBERTY**

81.     Plaintiff adopts and incorporates by reference paragraphs 11-80 of this complaint.

82.     While acting under the color of law, Defendants Campbell, Stewart,  and Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, violated Hart's rights and privileges granted to him by the United States Constitution and 42 U.S.C. § 1983 with reckless indifference, to deprive Hart of his fundamental right to life and liberty without due process of law in violation of his Fourteenth Amendment rights.

83.     The use of deadly force in the shooting of Hart by Defendants Campbell, Stewart, and/or Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, was unreasonable under the circumstances.

84.     As a direct and proximate result of such wrongful conduct by Defendants Campbell, Stewart, and/or Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, Hart was deprived of his life.

**WHEREFORE,** Plaintiff seeks the following relief:

    (a)     Such compensatory and punitive damages as a jury may award under the law;

    (b)     Pursuant to 42 U.S.C. §1988, her costs and reasonable attorney fees for pursuing this action; and

    (c)     Such other, further and different relief as to which she may be entitled.

**COUNT TWO**

**42 U.S.C. § 1983**
**EXCESSIVE FORCE**

81.    Plaintiff adopts and incorporates by reference paragraphs 11-80 of this complaint.

82.    While acting under the color of law, Defendants Campbell, Stewart, and/or Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, violated Hart's rights and privileges granted to him by the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983 with reckless indifference, seized Hart and executed him without a reasonable basis or any legitimate governmental interest and without due process of law.

83.    The deadly force of shooting Hart, used by Defendants Campbell, Stewart, and/or Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, was unreasonable under the circumstances, as Hart posed no immediate threat of harm to the Defendants, himself or the general public. No reasonably prudent officer, faced with similar circumstances, would have acted as Defendants Campbell, Stewart, and/or Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9 acted.

84.    The wrongful conduct of Defendants Campbell, Stewart, and/or Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, violated clearly established constitutional rights of which a reasonable police officer knew or should have known prior to and on the date said Defendants shot Hart.

85.    As a direct and proximate result of such wrongful conduct by Defendants Campbell, Stewart, and/or Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, Hart was deprived of his life.

**WHEREFORE,** Plaintiff seeks the following relief:

(a)   Such compensatory and punitive damages as a jury may award under the law;

(b)   Pursuant to 42 U.S.C. §1988, her costs and reasonable attorney fees for pursuing this action; and

(c)   Such other, further and different relief as to which she may be entitled.

## COUNT THREE
## FAILURE TO TRAIN, INSTRUCT, SUPERVISE, CONTROL OR DISCIPLINE AGAINST DEFENDANTS POLICE CHIEF DAN RARY, CORPORAL BENJAMIN GILES, LIEUTENANT JOEL GASTON, AND AGAINST CITY OF VESTAVIA HILLS

86.   Plaintiff adopts and incorporates by reference paragraphs 11-80 of this complaint as fully set forth herein.

87.   At all times material herein, the City of Vestavia Hills and the Supervising Defendants had a legal duty to adopt and implement training, rules, policies and procedures to ensure that its police officers appropriately restrain and take custody of citizens in a manner which is safe to all parties including under circumstances that apply to mentally ill citizens.

88.   The City of Vestavia Hills and the Supervising Defendants had exclusive management and control of the policies and practices of the Vestavia Hills Police Department regarding the method and manner of using weapons, use of deadly force, responding to persons with mental illness, and the means and methods for stopping a moving vehicle safely or keeping a stopped car from moving, and were responsible for ensuring that members of the Vestavia Hills Police Department otherwise conduct themselves in a skillful and lawful manner in undertaking and performing their duties. Defendant City of Vestavia Hills, and the Supervising Defendants, are vested with the authority to establish policies or customs, practices and usages of the Vestavia Hills Police Department through training, supervision, discipline and otherwise controlling the officers of the Vestavia Hills Police Department. Defendant Rary was, at all relevant times, Vestavia Hills's

primary policy maker regarding such training, supervision and discipline and his actions and failings constitute Vestavia Hills's custom, policy or practice.

88.     Defendant City of Vestavia Hills and the Supervising Defendants violated Hart's rights by the custom, policy and/or practice of failing to train, instruct, supervise, control, and discipline the police officers of the Vestavia Hills Police Department in the appropriate use of deadly force, de-escalation and the appropriate means for addressing individuals in a mental health crisis such as Hart's, in how to safely stop a moving vehicle or prevent a stopped vehicle from moving. Said custom, policy, practice, and usage caused the deprivation of plaintiff's rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983, and the laws of the State of Alabama.

89.     There exists within the Vestavia Hills Police Department unwritten customs, practices and usages for use of deadly force, de-escalation and the means for addressing individuals in a mental health crisis that are so pervasive that they constitute the policies of the department, such that they are and were the moving force behind and thereby caused the constitutional deprivations of Hart as have been set forth herein, including the practice of not contacting a community mental health officer when officers encounter a mentally ill person.

90.     The failure to train, discipline or supervise, Defendants Campbell, Stewart, and others at the Vestavia Hills Police Department in the constitutional means for using deadly force, de-escalating encounters with mentally ill persons and responding to those experiencing a mental health crisis, and in how to safely stop a moving vehicle or prevent a stopped vehicle from moving, has resulted in members of the Vestavia Hills Police Department using excessive force as a matter of custom when encountering non-felonious citizens or those with mental illness in violation of

clearly established law. Defendants' failure to train, supervise or discipline its officers in such areas is not objectively reasonable.

91.     The City of Vestavia Hills' failure to adopt appropriate polies and procedures for the treatment and response to mentally ill citizens involved in police encounters and failure to follow the Alabama law and recognized police procedures when dealing with mentally ill citizens amounts to deliberate indifference under 42 U.S.C. § 1983.

92.     As a result of the City of Vestavia Hills's failure to properly train, discipline or supervise Campbell and Stewart, in the use of deadly force, de-escalating encounters with mentally ill persons and responding to those experiencing a mental health crisis, and in how to safely stop a moving vehicle or prevent a stopped vehicle from moving, Defendants deprived Hart of his rights to be free from excessive force and unlawful and unreasonable seizure in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States and remediable under 42 U.S.C. § 1983.

93.     The acts of Defendants as described above were wanton, and/or exhibited a reckless indifference to the federally protected rights of Hart, thus entitling Plaintiff, on behalf of Hart's estate to an award of punitive damages against Defendants Rary, Giles, Gaston and The City of Vestavia Hills.

**WHEREFORE,** Plaintiff seeks the following relief:

    (a)   Such compensatory and punitive damages as a jury may award under the law;

    (b)   Pursuant to 42 U.S.C. §1988, her costs and reasonable attorney fees for pursuing this action; and

    (c)   Such other, further and different relief as to which she may be entitled.

**<u>COUNT FOUR</u>**
**<u>WRONGFUL DEATH</u>**

94.     Plaintiff adopts and incorporates paragraphs 11-80 of the complaint as fully set forth herein.

95.     While acting within their employment as police patrol officers for The City of Vestavia Hills, Defendants Campbell, Stewart, and Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, did negligently, carelessly and/or unskillfully cause the death of Hart in violation of Alabama Code § 6-5-410.

96.     While acting within their employment as police patrol officers for The City of Vestavia Hills, Defendants Campbell, Stewart, and Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, negligently, carelessly and/or unskillfully shot Hart in that they (1) violated the standard of care applicable to police officers; (2) violated the specific, mandatory and non-discretionary duties prescribed by the Vestavia Hills Police Department for performing their duties as police officers; (3) failed to undergo specific training to properly respond to person experiencing mental health issues and/or abide by any such training they received; (4) failed to adhere to the Alabama Code and standards requiring involvement of a mental health worker under the circumstances of Hart's encounter; 5) failed to adhere to known police standards for stopping a moving vehicle safely or preventing a stopped vehicle from moving; and 6) violated Hart's rights under the Fourth Amendment to the U.S. Constitution.

97.     Defendants Campbell, Stewart, and Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, acted negligently, carelessly and/or unskillfully, or in the alternative, willfully, maliciously, in bad faith, recklessly, beyond their authority or under a mistaken interpretation of the law or applicable policies.

98.     The wrongful, negligent, careless and/or unskillful acts of the Defendants Campbell, Stewart, and Fictitious Defendants Nos. 1, No. 4, No. 7, No. 8, and No. 9, as recounted above, led to Hart's unnecessary, avoidable, and wrongful death.

**WHEREFORE,** Plaintiff seeks the following relief:

> (a)     Such punitive damages for wrongful death as a jury may award under the applicable law;
>
> (b)     Her costs and reasonable attorney fees for pursuing this action; and
>
> (c)     Such other, further and different relief as to which she may be entitled.

## <u>COUNT FIVE</u>
## MUNICIPAL LIABILITY

99.     Plaintiff adopts and incorporates paragraphs 11-80 and of the complaint as fully set forth herein.

100.     While acting within their employment as police officers for The City of Vestavia Hills, Defendants Campbell, Stewart, and Fictitious Defendants No. 1, No. 3, No. 4, No. 5, No. 6, and No. 9, negligently, carelessly and/or unskillfully shot Hart in that they (1) violated the standard of care applicable to police officers; (2) violated the specific, mandatory and non-discretionary duties prescribed by the Vestavia Hills Police Department for performing their duties as police officers; (3) failed to undergo specific training for responding to those with mental health issues and/or abide by any such training they received; (4) failed to adhere to the Alabama Code and standards requiring involvement of a mental health worker under the circumstances of Hart's encounter; 5) failed to adhere to known police standards for stopping a moving vehicle safely or preventing a stopped vehicle from moving; and 6) violated Hart's rights under the Fourth Amendment to the U.S. Constitution.

101.     While acting within their employment as police officers for The City of Vestavia Hills, Defendants Campbell, Stewart, and Fictitious Defendants No. 1, No. 3, No. 4, No. 5, No. 6, and No. 9did wrongfully, negligently, carelessly and/or unskillfully cause the death of Hart in violation of Alabama Code § 6-5-410.

102.     For the acts of Defendants Campbell, Stewart, and Fictitious Defendants No. 1, No. 3, No. 4, No. 5, No. 6, and No. 9, that were done negligently, carelessly and/or unskillfully within the line and scope of their employment with the City of Vestavia Hills, the City of Vestavia Hills is vicariously liable under the doctrine of respondeat superior and Ala Code 11-4 7-190 for the negligent, careless, and unskillful use of deadly force, and response to the mental health crisis of Hart, by Defendants Campbell, Stewart, and Fictitious Defendants No. 1, No. 3, No. 4, No. 5, No. 6, and No. 9.

**WHEREFORE**, Plaintiff seeks the following relief from the City of Vestavia Hills:

      (a)     Such compensatory and punitive damages for wrongful death as a jury may award;

      (b)     Her costs and reasonable attorney fees for pursuing this action; and

      (c)     Such other, further and different relief as to which she may be entitled.

## COUNT SIX
### 42 U.S.C. § 1983
### FAILURE TO INTERVENE AS TO DEFENDANT CAMPBELL

103.     Plaintiff adopts and incorporates paragraphs 11-80 of the complaint as fully set forth herein.

104.     Defendant Campbell, and Fictitious Defendants No. 3, No. 4, No. 5, No. 6, and No. 9, while acting under color of law and within his employment as Police Officer, were deliberately indifferent to Hart's right to life and liberty granted to him by the United States Constitution by

failing to intervene so as to stop Defendant Stewart from using deadly force directed to Hart having been told that Hart was suicidal and should have known that Hart was suffering from a mental health crisis by the time Hart slowly drove away. Instead of intervening to stop Defendant Stewart from shooting at Hart, Defendant Campbell joined Stewart in shooting Hart.

105.    Defendant Campbell, and Fictitious Defendants No. 3, No. 4, No. 5, No. 6, and No. 9, were in a position to intervene, but took no action to stop, discourage and/or prevent Stewart from shooting at Hart and, did thereby contribute to the death of Hart depriving Hart of his rights under the Fourth and Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. §1983.

**WHEREFORE,** Plaintiff seeks the following relief:

      (a)    Such damages as a jury may award;

      (b)    Her costs and reasonable attorney fees for pursuing this action; and

      (c)    Such other, further and different relief as to which she may be entitled.

Respectfully submitted this the 7th day of June 2022.

<u>**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**</u>

**Attorneys for Plaintiff**

<u>*s/ G. Rick DiGiorgio*</u>
G. Rick DiGiorgio (ASB-0289-R72G)
Leila H. Watson (ASB-3023-S74L)
Brett C. Thompson (ASB-6700-R81T)
**CORY WATSON, PC**
2131 Magnolia Avenue South
Birmingham, AL 35205
T: 205-328-2200
F: 205-325-7896
rdigiorgio@corywatson.com
lwatson@corywatson.com
bthompson@corywatson.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 7, 2022, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following:

J. Bentley Owens, III (ASB-1986-044J)
Grace Graham (ASB-3040-A64G)
**ELLIS, HEAD, OWENS, JUSTICE, & ARNOLD**
113 North Main Street
P.O. Box 587
Columbiana, Alabama 35051
Phone: (205) 669-6783
bowens@wefhlaw.com
ggraham@wefhlaw.com

*Attorneys for Defendants*

*/s/ G. Rick DiGiorgio___*
Of Counsel